My name is Mark Sigman, and I represent the relator in this case, and by extension, the taxpayers of North Carolina. The defendants in this case are a group of adult care homes, and they bill Medicaid about 12 hours for each eight-hour shift that their employees worked. That's shocking on its face, and the question here is simply whether that's allowed under the law. Now, maybe that was allowed before 2013, when providers could and did bill per diem, but the policy was changed in 2013 explicitly to prohibit exactly that type of per diem billing, and instead to require billing by time for time actually worked. But the defendants here simply ignored that change, and they kept doing what they had been doing. They put their head in the sand because they wanted to keep billing the maximum while working the minimum. By doing so, they violated the False Claims Act, and they should be required to repay what they overbilled. The plaintiff's first claim here is a simple one, that defendants submitted false bills to Medicaid because they claimed that they provided certain numbers of hours of care, when in fact, they did not provide those hours of care. The main policy at issue here, as we outlined in the brief, is Policy 3L. The plain text of Policy 3L controls in this case. It clearly requires that defendants and everyone else bill by units of time, 15-minute increments, for time actually worked. And that plain text is buttressed by other parts of the plain text of Policy 3L. For example, the seven-eighths rule, that is all about minutes. Second, the entire purpose of Policy 3L is maximum number of hours. All of these beneficiaries... Well, even the seven-eighths rule isn't a strict time rule because you can round something off to 15, even if you only spent eight minutes doing it. That's right, Your Honor, and that's the purpose of the rule, but the existence of that rule shows that you have to bill by time, for time worked. If you could bill per diem as defendants here, there's no purpose at all to the seven-eighths rule. But there's also the entire purpose of Policy 3L. I don't think they're saying bill per diem here. I think they're saying bill on a completed task basis. Well, Your Honor, so number one, it's impossible to bill by completed task basis because there is no time allotted to tasks. And there just isn't. It's impossible to do that. And frankly, the defendants in their brief admit that it's impossible to do that. So I think... Well, I thought that one of the arguments they were making here was that completed task was a proxy for time in the sense that a certain number of authorized hours were assigned to each task. So, Your Honor, I want to be very clear. There were no number of authorized hours for every task. It is impossible to add up X, Y minutes for this and Y minutes for that to get to a number. It's impossible to do that. Now, Your Honor, I think the confusion about that is not the fault of the court at all, because the defendants made that argument below. And I think it confused the district court as well, because the district court... Why aren't the tasks a proxy for the time spent? I mean, in this sense that you can't determine whether there's a strict dichotomy about the completed task basis and the time devoted basis, because as I say, if you complete a task, you have to spend some time completing the task. The task doesn't complete by itself. I wish it did, because then I could take off many a weekend and I could come back to my desk on Monday morning and find that the work was somehow done. And I just wonder whether there's this stark dichotomy that you're positing. Well, Your Honor, two responses. One is that the beneficiaries receive only one total number of authorized hours. It's a maximum number, an up-to number. It cannot be broken out by tasks in any way. And so if a beneficiary comes to the defendant, let's just say John, and John has 120 authorized hours. That's the only number. It's a single number. It's not broken out. And so what the defendants do is always, always, always bill the 120. And that's why it's per diem billing. They never look at the tasks. In fact, the billing people don't even know about the tasks. They have no idea what tasks are actually performed. And so they're billing here the same way that they were billing before the policy was enacted. And so the only way that defendants, and I gave them sort of credit for their theory in the brief, is that, well, if we always perform all of the tasks all the time and never miss a single one, then even though we don't track time and even though we per diem billing, well, per diem billing would be okay because we always do all the tasks. Well, wouldn't it, just again, isn't the completed task what's of most interest to the residents of a senior center? I mean, if someone, if a resident is having difficulty dressing or bathing or toileting or whatever, what would you rather have? Someone who completes the task and helps a resident feel fresh and all the rest or someone who spends time but doesn't have anything to show for the time In other words, I'm wondering whether the completed task metric isn't more or could be seen as more providing more of a real life benefit to the actual residents of this center because I've seen a lot of people who are working by the clock and they're just sitting there. And then there are other people who may spend less time in an office and get a whole lot more done. And so I'm just wondering from the standpoint of the ultimate beneficiaries of this North Carolina Medicaid, well, a task completed metric, it makes a certain amount of sense, wouldn't you think? So Your Honor, putting aside what policy 3L actually allows, I understand Your Honor's concern, what's best for the beneficiaries. I think it's clear that what's best for the beneficiaries is not what's happening here. So yes, it's important that the tasks be completed. Obviously, we want tasks to be completed and people to be cared for. However, there are separate audits about that issue. Whether the tasks are completed is sort of a separate issue from how the defendants here bill for that. Now, by the way, because of how they bill, they are not doing all the tasks. And we noted that. But that's a different issue. And one of the questions I have is when you're talking about a fraud case, and that's what we're talking about here, where is the deception? You might not like the billing method, but normally you have to have some sort of knowing deception, which is calculated to induce reliance. And was there deception here? Did they fail to disclose their books or what? So yes, there was deception here. Under the FCA, you know, the two things I think Your Honor is talking about are materiality and scienter. You do not need to show that you absolutely knew what you're doing was wrong. Deliberate indifference, sticking your head in the sand. That's enough. Let me address that very briefly, because I think that's both of those are clear. Materiality. First, there's the objective standard. The defendants don't even mention that in their brief. That's purely objective. And I suggest that under policy 3L, it's completely unreasonable for the defendants to think that they don't have to bill by time, that they can always bill the maximum. But I think you're not answering my question, because what I wanted to know is that these books are monitored by the North Carolina DHHS, the Health and Human Services Department of North Carolina. I didn't see any indication that they thought that there was deception or whatever. It all seemed to relate to the method of billing. The method of billing is a different question from whether there is deception. And deception is a normal element of fraud. And where is, were they hiding the order to say that in the course of the extensive discovery? There was deception, because the auditors never looked at what mattered here. The only thing the auditors looked at is they went to the... Did the auditors think there was any kind of deception? No, because the auditors didn't look at what matters here. The auditors only look at the task logs. They want to know, hey, are all the tasks checked off as completed? Well, the auditors have a pretty intimate acquaintance with how this billing system works. And there was lengthy discovery on both sides. And I just don't see the kind of concrete evidence in the summary judgment record of deception. Well, so again, the auditors never looked at what was going on here. Nobody knew that they were billing every single hour, no matter what, even though they were staffed to the absolute minimum. Nobody knew until this case... Mr. Zegman, let me ask you about that. They talk about a 2016 audit during which they were asked for... The care homes were asked for Mr. Stahlschmidt was confused by that because they didn't keep track of the time and reached out to North Carolina Medicaid and said, basically, what does this mean? We're not required to keep track of time. We don't do it. And North Carolina, someone from North Carolina Medicaid told him, basically, don't worry. Someone will get back to you if there's a or shouldn't be doing with their bills. But it does indicate some lack of science to judge Wilkinson's question, some sense that nothing's being hidden here. People may be confused and they might be doing it wrong. But where is your sort of contrary evidence that, in fact, there was deception and an attempt to sort of hide what's going on? So first of all, Mr. Stahlschmidt admitted that when policy three was first rolled out, he just did not understand how that actually applied to adult care homes. He admitted he didn't understand it, but he didn't go and ask for clarification. Instead, he talked to a friend of his and they just decided, hey, this just must not apply to adult care homes. I think that's classic sticking your head in the sand. If you don't understand something like that, this is hundreds of millions of dollars a year defendants billing the state. I think you should be required to at least ask for clarification. And, you know, it's important to note that the standard for planter, of course, is very low on summary judgment. The Skybook case that the defendant site notes that it's very, very rarely appropriate to grant summary judge. I don't know. The Supreme Court has actually indicated that summary judgment is a very appropriate tool in these cases. I mean, I think they've said that. I agree about materiality. The court has said that it can be, but on specifically on Cienter, which is the question asked now, this court in the Skybook case recognized that Cienter, of course, is the state of mind. It's hard to prove. It's usually proved by circumstantial evidence. We resolved it there and in Complin. And Complin, I think, is very similar because you had a disputed interpretation about how someone should interpret a regulation. And, you know, in your brief, you say that your Cienter argument is based on how plain the regulation is. Do you have anything else that demonstrates the required state of mind other than how clear you think the regulation is? Well, again, Mr. Stolschmidt admitting that when policy 3.0 was rolled out, he didn't understand how it applied, and he stuck his head in the sand. Furthermore, you know, the billing people here are totally separate from the people who know about tasks. And so there's no connection. The defendants have no connection between the billing folks and the task. Well, but what other cases are there to follow on Judge Rushing's question? What other cases are there where a Keytown suit has been allowed to go forward where there's been no deception and where the auditors, where there's been auditing and the auditors have raised no question? I mean, I always thought that with cases like Iqbal and Twombly, that the Supreme Court on cases, this is a little bit different because it was dealing with securities fraud. But I thought that the Cienter element in some of these fraud cases, and this is a genus of, it's a species of fraud. I thought the Supreme Court was requiring at the motion to dismiss stage plausibility. And I don't see why that wouldn't carry through to the subpoena stage as well. And there are all kinds of, there are all kinds of indications, shall I say, that fraud claims just shouldn't be forward, shouldn't be allowed to go forward on accusation. And one is what we've just pointed to in Iqbal and Twombly. And you see the same thing, a reinforcement of that in the Federal Rule 9 civil procedure, where I think that the fraud claims are supposed to be proven by clear and convincing evidence. And in the face of all this, if we say, oh, no, there's no problem here. This fraud claim can go forward simply because of a dispute over the interpretation of a regulation. That's where the auditors were not raising questions. We're actually making the payments. But if we say that any sort of dispute over regulations, and my lord, the Code of Federal Regulations has, I don't know how many regulations about which there could be a dispute of interpretation. And we're just off to the races if we say that CNR has proven whenever people have, when there's no deception, but people have a simply different view of a regulatory scheme. I just think opening that door is very difficult. Wouldn't you agree? Yes, I see that my time has expired. No, you wouldn't agree with it. Tell me why not. Very briefly, your honor, since my time has expired, but I want to answer the question. So number one, I think the text here is plain as day. And so there's not a reasonable dispute about what it means, but going to CNR, again, the FCA was amended specifically to disallow sticking your head in the sand. And so even if the defendants were confused about what policy 3L meant, which they claim, you can't just say, you know what, I'm not going to ask. I'm not going to figure it out. Because there could have been just one document in this case, just one that allowed them doing what they did. Just one document saying you can build per diem or always build a maximum number of authorized hours. I mean, it would have been so simple. You would think out of an 8,000 page joint appendix, there would be one document. Is that how the template works? Isn't that how the billing template from the state works? It takes the authorized hours and it distributes them over the week or over the month? Can you refresh my recollection on what the record was on that? With respect, your honor, I'm not sure exactly what document you're talking about. There is a chart that's attached to the policy 3L that lists the minutes that are used in a way that nobody knows to add up to the total number of authorized hours. But there is no document that, I mean, and then, you know, the defendants create a plan of care that says we're going to do these tasks on these days. But notably, that plan of care does not have any minutes attached to each task or each day because you can't do that. And so the plan of care has one number at the very top. It says 130 hours and that's it because you can't break it down. Real quickly, your honor asked for a case about Sciento. We cited the Kreisler case from the D.C. circuit in 97 where a doctor failed to review his bills and the court noted that if he had reviewed them, it would have shown claims for excessive hours. Counsel, can I shift for just a minute from Sciento to materiality? And I'm just not sure how we would work around the Supreme Court's Escobar case and particularly this paragraph. It says, conversely, if the government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or if the government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated and it signaled no change in position, that is strong evidence our requirements are not material. And then as I understand the record here and if you look at JA-6119, you seem to see this, that the government not only passed claims challenged by the plaintiffs, but it is continuing to pay the claims submitted by the defendants. Now, given that and those comments about materiality in Escobar, how do we work around that? So, Your Honor, first off, the government here did not know what was happening until this case was filed. The audits do not look at what matters. So, the government was not paying here with full knowledge of what was happening. So, that information from Escobar just does not apply. It is exactly opposite in the Escobar case, for example, where the FDA there clearly did, clearly understand what was going on. Now, as far as DHHS continuing to pay as this lawsuit is going on, many cases have held that that is not surprising at all. That could be because of bureaucratic indifference or neglect. The state here is changing its plan. So, maybe it just does not care because there is no prospective effect. I find that hard to believe that you think the government did not know what was going on here. It is auditing the books. It is the one that is paying the bills. To sort of say, well, the government had no idea, then that might be a suit against the government. But, well, that runs into different difficulties, but I am not sure. To say that the government had no idea what was going on here, the government knew that the past practice in this instance was on a completed task basis. There was no change, as far as I can see, to a time-devoted basis after this amendment was put into effect. But, given that the completed task was the basis for the bills prior to the change and there was no particular alert that the practice had, that there was a completely different method of billing after the change, and you say, well, the government had no idea about any of this, I cannot believe that they were continuing to do what they had always done. It strikes me as odd to claim, well, the government had no idea when the government has seen this other billing practice for years. It is just hard to say, well, we are going to string these folks up when the regulation is confusing and when auditors have not found any non-compliance. I mean, there are companies all over the country, contractors all over the country that have tried to deal with the government in good faith, but they are at a disadvantage with this morass of confusing regulations. And sometimes it drives people crazy. But I have one final question. This is a treble damages statute. So we are not just talking about ordinary damages here, we are talking about some huge sum. And a treble damages statute, as I understand it, the more conservative estimate of the defendant's overpayment or the overpayment over five years would be something like $43 million. And then because it is trebled, you would put them on the hook for $130 million. And then aside from that, they would be liable for the relative's attorney's fees and all reasonable expenses incurred by the relative in bringing the litigation and everything. And I don't see how the defendant can survive on something with a hit like that. A lot of these nursing homes, it's not all that profitable business. Some of them work on a very, thin margin. I understand the state wanting to cut down on the amount that they're spending on Medicare and Medicaid. Medicaid is a huge chunk of the state legislature's budget. And I understand from doctors to hospitals, they complain loudly and regularly about the rates of reimbursement. So I'm sympathetic to both sides here. But I worry about going into waters that are realized. And if I'm talking about $130 million judgment being awarded against the defendants plus attorney's fees and expenses and everything like that, isn't that a pretty heavy hit? That just could be it for this facility. And maybe they're doing a good job, but maybe they're not. But if they are doing a good job, how does a hit like that advance public health in North Carolina? That's what I'm wondering. We're talking about, when you treble it, you're talking about huge sums. Do you see my concern here? Very briefly, Your Honor. Yes, I certainly see your concern. There's no evidence in the record about how much money these defendants have. They are together the largest provider in the state. It's not in the record, but I can assure you it's a very profitable business. And these guys make a lot of money. If Your Honor's concern is about the quality of care in North Carolina, if it's about what old people and people with problems, how they're being affected and to make sure they're at the best care, if that's the court's real concern, I urge the court to read the facts section of our brief closely, read the briefs closely, because I very strenuously believe that care is what matters, that the plaintiff here, the relator here, we're the ones that are trying to vindicate the interest. Well, I mean, I think quality of care is a different suit. But, you know, there was a judge from South Carolina who's a very fine judge, and his name was Bob Chapman. And when I first got on the court, he said, you know, one thing you need to remember is do no harm. Just don't make things a whole lot worse. And I just worry about what you're asking us to get into. We don't know how to devise a time-based system, or what that would add to red tape or whatever. I mean, I just wonder whether this is outside of our bailiwick. But I'm worried that we could inadvertently do a good deal of harm. That's my problem. And it's not that I'm not sympathetic to what you're saying, because as a state legislature, I'd be very concerned about the percentage of the state budget that was consumed by these galloping health care costs. But the other folks of it, you know, they've got a point too. And aren't we at risk of doing some unintentional damage? I mean, we could be walking into an ambush. This is my problem. And I'm sorry for the length of the question, but the length of it is because of the depth of my concern. And so I'd like to give you a chance to respond to that, Mr. Sigmund, if you would. Sure. My main response is that the North Carolina system is being transitioned right now to the managed care model, and totally different. This entire way of billing, paying is totally different, literally right now. And so this case will have no prospective effect at all. The only effect this case will have, the only effect is a retroactive for money damages to whatever extent we can prove them at trial. That's it. And so I understand the court's reluctance. This court is not a policymaking body. It doesn't want to get into the weeds and start interfering with complex state agency determinations. I get that. I don't want to do that either. I'm a lawyer, and I don't want to do that. But I believe with all due respect that this case is asking this court to do something that's directly in its bailiwick. Apply the False Claims Act as Congress enacted it, with the intent behind Congress enacted it, what about Scienter and everything else, and to stop false bills. Well, not stop them, but to remedy false bills in the past. And so I think it's clearly in the court's square jurisdiction. Thank you. All right. I want to ask, don't go away, don't go away, because my colleagues may have some questions for you. Judge Fraxler, do you have some questions? No, thank you. I have no questions. Judge Reisching? I don't. Thank you. All right. Mr. Phillips, then we'd be happy to hear from you. Thank you, Your Honor. May it please the court. My name is Jim Phillips with the law firm of Brooks, Pierce, McClendon, Humphrey & Leonard in Greensboro, North Carolina. I'm here along with Jennifer Van Zandt, D.J. O'Brien, and Kim Marston on behalf of the appellees. Your Honor, I'd like to focus my argument today on the materi- on the scienter and materiality elements of the False Claims Act. We believe, in particular, that Relator has failed to come forward and meet the standard required for evidence of those at this stage of the case. The first thing I'd like to do is to address Relator's counsel's statement about- that suggested that Mr. Stahlschmidt stuck his head in the sand. That Mr. Stahlschmidt testified that he didn't understand the billing requirements of Policy 3L. Relator says that in both of his briefs and cites there to the joint appendix at pages 2073 to 75, where Mr. Stahlschmidt says no such thing. What he said is that he didn't understand why the 7-8 rule was in Policy 3L. And that makes sense from the adult care home perspective because all of the Medicaid- North Carolina Medicaid witnesses who testified, testified explicitly that the 7-8 rule didn't apply in adult care homes. So, that's not what Mr. Stahlschmidt testified to. Relator says in both his opening and reply briefs that there is plenty of evidence of CNR, but then he offers none. He offers as his only proof the contention that Policy 3L is so clear on its face that a provider may bill only for the time actually spent that the defendants had to know that was what was required. That harkens back to this court's decision in Coplin, and we do believe that Coplin and Schiebo are on direct point here. In Coplin, the district court summarized Relator's allegations of CNR, and that summary reflects the extent of Relator's evidence here. To quote, Relator asked the court to infer CNR from the alleged regulatory violation itself. Because the hospitals were sophisticated entities presumed to know the law, Relator argued, their failure to comply could only have been knowing. That was insufficient there. It is 3L says nowhere what Relator says it says. Its only reference to billing is in the appendix, where it directs providers to bill in 15-minute units, but it says nothing about what providers may or may not bill for. Overlaid on that language or lack of language in Policy 3L is the guidance that North Carolina Medicaid provided to defendants from the time the policy was adopted until today. Guidance that providers in adult care homes don't have to track the time spent providing PCS. That if defendants provided the PCS call for on a resident's service plan on a particular day, they could bill the time on that plan for that day. That even if defendants didn't accomplish all of the subtasks associated with the particular ADL, as long as they accomplished one, they could bill for the whole ADL. And the fact that such guidance was given was not only confirmed by the North Carolina Medicaid witnesses, it was reiterated by them in their deposition testimony as their current interpretation of the policy. And as this court has acknowledged, following government instructions cannot be a false claim. But even if you ignore the guidance to defendants from North Carolina Medicaid regarding what you could bill for, the testimony of those same witnesses regarding what Policy 3L says and doesn't say, specifically the lack of clarity on billing and reimbursement, would compel affirmance based on the CNR element. First, it's undisputed that all of the rules related to North Carolina Medicaid's PCS program are in Policy 3L, nowhere else. And testifying about billing and reimbursement, those North Carolina Medicaid witnesses said on the record that Policy 3L doesn't speak specifically to time and indicate whether providers should bill based on specific time. The policy they said is, I quote, silent on that. They said Policy 3L doesn't speak to billing practices, that it doesn't prescribe billing practices. And each one of them said that the 7-8 rule doesn't apply in adult care homes. At best for a relator, this establishes that Policy 3L is ambiguous as to whether defendants could bill only for time spent providing PCS. And as this court recognized in Complin, even the loosest standard of knowledge is difficult to prove when falsity turns on a disputed interpretive question. This case does not present the hypothetical situation the court discussed in Complin where a defendant might be warned away from an interpretation. Here, the defendants were guided into their interpretation that if they deliver the PCS on a service plan, they could bill the units for that day. And the affidavits of Mr. Campbell at 6099 of the joint appendix and Mr. O'Neill at 6121 confirmed that the assisted living industry as a whole interpreted Policy 3L this way, based on North Carolina Medicaid guidance. And as this court explained in Scebo, an industry-wide understanding such as this negates the notion of CNR. Perhaps the strongest evidence that defendants lack CNR is in the affidavit of Tom Stahlschmidt. And I won't go through that again because Judge Rushing laid it out piece by piece. Members of the court, that's not how you act if you're trying to hide fraudulent billing practices. Turning to materiality. The U.S. Supreme Court said in Escobar that the materiality standard in a False Claims Act case is demanding. Relater must show that the alleged false statement was material to the government's decision to pay the defendant's claim. The evidence in this case establishes that the amount of time spent providing PCS was not material to North Carolina Medicaid's decision. Ms. McFadden, who best and plainly at 6394 of the joint appendix, I asked her, tell me whether or not this is true, that the amount of time spent providing PCS by a provider doesn't matter to the billing as long as the tasks associated with the ADL were performed. She answered, based on our discussion, if the task was performed, they could bill for the time, for the service. No matter how much time was spent, yes. And that bill would be paid by North Carolina Medicaid, yes. Further proof of the lack of materiality is that defendant's audits did not check to see the amount of time spent, only whether the tasks were performed on particular days. Finally, with regard to materiality, it's been four and a half years since the government saw the complaint in this case. Defendants are still billing the same way they did and on the same basis that they were then. They're staffing at the same levels. The government is still paying. The Assistant Director for Investigations, Patrick Pickett, for the Office of Program Integrity of North Carolina Medicaid testified that his office has not undertaken to investigate or audit these issues. Policy 3L hasn't been amended to change anything relevant here. If this mattered to the government's decision to pay, that would not be the case. Members of the Court, if you have questions, I'm happy to answer them. All right. I believe my colleagues have questions. We'd be happy to address those to Mr. Phillips. This is Judge Trax. I have a question. Mr. Phillips, is it your position that the method of billing used by your client was in conformity with regulation or was not in conformity with but you did the best you could based on the information you were given by Medicaid authorities? Both, Your Honor. We believe that we billed consistently with the way that Medicaid told us and therefore there is no falsity. Judge Rushing asked a question that goes to this. She referenced the fact that North Carolina Medicaid told providers to break down the total hours in a month and that comes from the joint appendix at page 5487. It's actually in the record a number of times but this is 5487 is a billing seminar that was put on by North Carolina Medicaid. Mr. Phillips, I appreciate all that but really my question was, I think, a lot simpler. Your position is that the way you did it was right. Is it also your position, a fallback position, that even if it was wrong there's no scienter? Yes, sir. That's exactly our position. I just want to make sure I understood. Thank you, Judge Wilkinson. Do you have any further questions, Judge? No, not me. Judge Rushing? I don't either. Thank you. All right. Thank you, Mr. Phillips. We'd like to hear from Mr. Sigman now in rebuttal. Thank you, Your Honor. May it please the court. I welcome any questions if the court has any further ones. I covered 30 minutes on the first half so we covered a lot of ground. In response to Mr. Phillips, just a couple points. You know, he mentioned the testimony of Ms. Lee. What's interesting is that he didn't mention the testimony of Ms. McFadden. Ms. McFadden was shown exactly how the defendants billed in this case, exactly how, and she said, quote, I would not agree that that was the correct thing to do. Furthermore, defendants counsel consistently, multiple times, tried to get Ms. McFadden to agree with this that a provider can bill for a day has no relationship to the amount of time providing PCS on that day. They tried to get her to agree with that proposition because it perfectly describes how they billed and she consistently refused to agree with that. Ms. McFadden also testified, quote, there's not a daily entitlement to reimbursement. And again, it's important to note the entire purpose behind policy 3L is a maximum number of hours. It's authorizing a maximum. They treat it as an entitlement. And the entire purpose of policy 3L is reimbursing. Actually, it reminds me of a question I had for you. In your brief, you refer to this as a maximum number when you're talking about the false and fraudulent bills. But I was a little confused in the, when you talk about implied certification, I think you turn to talking about this number as this number is what is required to give the patient care, to give the beneficiary the care they need. And anything less than that number of hours is deficient care, which seems to not treat the number as a maximum. And I wanted to give you an opportunity to clarify that. Well, right. So for the implicit claim, the beneficiaries are given a certain number of hours, let's say 120 hours. That would be an up to maximum. And so of course, they need that amount of care, but that's the maximum amount that can be billed. And so the defendant, if someone's authorized for 120, the defendant should be giving them 120 and then they should bill 120 and they need 120. The problem is though, if defendants don't provide 120, if they provide only 80, then they should bill 80. And so, I mean, the answer is the authorized hours is what they need. That is a true statement, but it still is a maximum number, meaning you should bill up to that maximum. Now, hopefully you provide all that care, but if you don't provide it, then you're billing more than the maximum. You're treating it not as a maximum, but as a set entitlement. Very briefly, Mr. Phillips mentioned billing by tasks. Again, that's just impossible to do. And finally, I do want to just reiterate the point about the fact that DHHS has not intervened here. Many cases have recognized that that's not controlling here. To some degree, it's not particularly important. The Prather case in the Sixth Circuit, for example, noted that the government's lack of intervention in a case or changing anything, what they do after a case has been filed would undermine the very purposes of the FCA, of the False Claims Act. If you always needed the government to take some sort of action, then you wouldn't need private plaintiffs like the plaintiff here to do what they're going to do. Second, one reason DHHS may not have intervened is because they might think that they have great lawyers right now doing all the work. Why would they intervene? We're having an oral argument right now where all these issues are on the table. Finally, Mr. Phillips, as brief, always talks about guidance from DHHS. I just want to be clear. There is no guidance here that says that they can do what they do. Not one document. There could have been one document that said, hey, you can bill per diem, or you can bill the set amount of hours per month per beneficiary, but that just does not exist. Finally, again, the entire, and this goes to Santa too, the entire purpose of Policy 3L was to change how people were being billed. In fact, some people at DHHS did not like that change. There was testimony. We deposed them, and they said, I didn't like that. I did not like going from the per diem to this time-based billing. I didn't think it made sense, but you know what? That's what happened. That goes to materiality of DHHS, but it also goes to Santa. Everyone in this industry understood that when Policy 3L was enacted, it was designed to change what happened here. It was designed to make a change. Can you tell me where, excuse me, let me interrupt you just a second. This is Judge Traxler. Can you tell me where that is in the record? The statements you've made about everybody in the industry recognizing the change and many objecting to it. Yes, Your Honor. Give me one second. I apologize for not having that on my... Joint Appendix 1528 to 31. Yeah, 1528 to 31. Thank you. Thank you. If anyone has any questions, I welcome them. Otherwise, I appreciate your time. Thank you. We thank you, Mr. Sigmon. Any further questions from anyone? Not me. All right. We will take a five-minute recess and then start into our final case. This Honorable Court will take a brief recess.
judges: J. Harvie Wilkinson III, Allison J. Rushing, William B. Traxler Jr.